UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  STUBHUB REFUND LITIGATION<br><br>This Document Relates to All Cases | Case No.  20-md-02951-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 39 |

Pending before the Court is Defendant StubHub, Inc.'s motion to compel arbitration.  Dkt. No. 39.  The Court heard argument on this motion and subsequently requested supplemental briefing.  *See* Dkt. No. 58.  For the reasons detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## I.    BACKGROUND

On August 6, 2020, the Judicial Panel on Multidistrict Litigation transferred several cases against Defendant StubHub for coordinated or consolidated pretrial proceedings with related actions already pending before this Court.  *See* Dkt. No. 1.  On November 18, 2020, the Court appointed Tina Wolfson and Tiasha Palikovic as interim class counsel.  *See* Dkt. No. 28.  Plaintiffs—over fifty individuals—filed their consolidated amended complaint on January 8, 2021.  *See* Dkt. No. 36 ("CAC").

The putative nationwide class action concerns Defendant's refund policy for events affected by the COVID-19 pandemic.  *See id.* at ¶¶ 1, 98–111.  Plaintiffs allege that Defendant wrongfully changed its policies for refunds for cancelled or rescheduled events as a result of COVID-19.  *Id.* at ¶¶ 1, 4.  Plaintiffs allege that for years prior to COVID-19, Defendant had assured customers via its "FanProtect™ Guarantee" that ticket purchasers would receive full

United States District Court
Northern District of California

refunds for cancelled events.  *Id.* at ¶ 1.  However, in March 2020, in light of the COVID-19 pandemic, Defendant announced that instead of a refund, it would issue a 120% credit when an event was cancelled.  *See id.* at ¶¶ 7–8, 10.  Plaintiffs allege that on March 25, Defendant also "changed the terms of its FanProtect™ Guarantee on the backpages of its website," instead stating that "if the event is canceled and not rescheduled, you will get a refund or credit for use on a future purchase, as determined in StubHub's sole discretion (unless a refund is required by law)." *Id.* at ¶¶ 8, 83.  Each Plaintiff alleges that he or she purchased tickets on StubHub between September 12, 2019, and July 24, 2020, for an event that was scheduled to take place in 2020, and that Plaintiffs were not offered a full refund for the canceled events.  *Id.* at ¶¶ 4, 19–74.

Plaintiffs allege that Defendant continues to advertise its FanProtect Guarantee, and has not clarified to users that StubHub no longer provides a money back guarantee.  *See, e.g.*, *id.* at ¶¶ 91, 97.  Based on these allegations, Plaintiffs bring causes of action under state consumer protection laws and for breach of contract.[1]  *See id.* at ¶¶ 122–470.

Defendant now moves to compel arbitration.  *See* Dkt. No. 39.  It contends that all transactions with StubHub are governed by the StubHub User Agreement.  Defendant states that since 2003, the User Agreement has contained an arbitration provision.  *See id.* at 9.  Defendant urges that all Plaintiffs were notified of and agreed to the User Agreement when they (1) created StubHub accounts; (2) used StubHub's website; and/or (3) purchased tickets through the StubHub website.  *Id.* at 4–7, 12–15.  Defendant further argues that even "guests" buying tickets on the website had to agree to the User Agreement before they could purchase tickets.  *See id.* at 5.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable."  9 U.S.C. § 2; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting federal policy favoring arbitration); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460

---

[1] Plaintiffs bring causes of action under California, Arizona, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Virginia, Washington, and Wisconsin law.  *See* CAC at ¶¶ 122–470.

United States District Court
Northern District of California

U.S. 1, 24 (1983) (same).  The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  This federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."  *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989).  Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration."  *Id.*

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue."  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.  *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2).

## III.   DISCUSSION

In support of the motion to compel arbitration, Defendant contends that in purchasing tickets through StubHub's website and mobile application, all 56 named Plaintiffs agreed to StubHub's User Agreement.  *See* Dkt. No. 39-2, Ex. A at 1.  Defendant appears to acknowledge that this agreement has changed over time, but asserts that at all relevant times it contained an arbitration provision.  *See* Dkt. No. 48 at 6, n.2.  The current User Agreement states in relevant part:

> **If you reside in the United States or Canada, You and StubHub each agree, except where prohibited by law, that any and all disputes or claims that have arisen or may arise between you and StubHub relating in any way to or arising out of this or previous versions of the User Agreement (including this Agreement to Arbitrate, as the term is defined below) or the breach or validity thereof, your use of or access to the Site or Services, or any tickets or related passes sold or purchased through the Site or Services**

United States District Court
Northern District of California

**shall be resolved exclusively through final and binding arbitration administered by the American Arbitration Association ("AAA") in accordance with its Consumer Arbitration Rules ("Rules"), rather than in court, except that you may assert claims in small claims court, if your claims qualify and so long as the matter remains in such court and advances only on an individual (non-class, nonrepresentative) basis (together with subsections 22(A)-(F), the "Agreement to Arbitrate"). This Agreement to Arbitrate is intended to be broadly interpreted.** The Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate.

Dkt. No. 39-2. Ex. A at 15, ¶ 22.1 (emphasis in original).  Plaintiffs do not appear to dispute that Defendant's User Agreement(s) contained an arbitration provision.  Rather, Plaintiffs' response is twofold.  Plaintiffs contend that (1) they did not agree to the User Agreement; and even if they had, (2) the arbitration provision is not valid or enforceable.  *See* Dkt. No. 44 at 9–30.

### A.  Formation of Agreement to Arbitrate

Plaintiffs argue that they did not receive adequate notice of the arbitration agreement, and therefore cannot be bound by it.  *See* Dkt. No. 44 at 15–21.

"In determining the validity of an agreement to arbitrate, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'"  *See Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[2]  "An essential element of any contract is the consent of the parties or mutual assent."  *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270 (Cal. 2001); *see also* Cal. Civ. Code §§ 1550, 1565.  Mutual assent "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."  *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (Cal. Ct. App. 2012) (quotation omitted); *see also* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .").  "[A] party's subjective intent, or subjective consent, therefore is irrelevant" to the question of mutual consent.  *See Stewart v.*

---

[2] Here, the parties agree that California law applies.  *See* Dkt. No. 60 ("Hrg. Tr.") at 8:5–10:1.

United States District Court
Northern District of California

1   *Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1587 (Cal. Ct. App. 2005) (quotation omitted).

2          As the Ninth Circuit has explained, when determining whether there is a binding

3   agreement formed through websites, courts generally evaluate contracts as falling into one of two

4   categories: (1) "browsewrap" agreements, where the website's terms and conditions are provided

5   to users via a hyperlink at the bottom of a webpage and a user's assent to the terms is assumed by

6   her continued use of the website; and (2) "clickwrap" agreements, where a user is presented with

7   the terms and conditions and must click on a button or box to indicate that she agrees before she

8   may continue. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–77 (9th Cir. 2014).

9   Websites may also present some hybrid of the two, such as putting a link to the terms and

10  conditions on the web page near a button that the user must click to continue.  Regardless, "the

11  onus [is] on website owners to put users on notice of the terms to which they wish to bind

12  consumers." *Id.* at 1178–79.

13         Here, the parties' initial briefing focused on the StubHub website.  In support of its motion

14  to compel, Defendant submitted a declaration from Todd Northcutt, a Senior Director of Product

15  Management at StubHub, which made only passing reference to Defendant's mobile application.

16  *See* Dkt. No. 39-1 ("Northcutt Decl.").  Mr. Northcutt acknowledged that users may purchase

17  tickets either through the website or mobile application. *See id.* at ¶¶ 4, 7, 12.  On the day of the

18  hearing, Plaintiffs filed an administrative motion to introduce additional materials in opposition to

19  the motion to compel arbitration, including four screenshots of the "sign in" and "checkout"

20  screens from Defendant's mobile application.  *See* Dkt. No. 54.  Although the Court denied the

21  administrative motion as improper, during the hearing Plaintiffs again suggested that the existence

22  of an agreement between the parties to arbitrate may depend on whether Plaintiffs purchased

23  tickets on Defendant's website or through its mobile application.  The Court requested

24  supplemental briefing on this issue.  *See* Dkt. Nos. 58, 59.  Because the nature of the notice that

25  named Plaintiffs received may depend on the platform on which they purchased their tickets, the

26  Court addresses the notice that Defendant provided on the StubHub website and its mobile

27  application separately.

28  //

United States District Court
Northern District of California

### i. Website

Defendant has indicated that according to its records, 32 of the named Plaintiffs purchased their tickets as registered users on the StubHub website and 16 of the named Plaintiffs purchased tickets as guests on the StubHub website. *See* Dkt. No. 59-1 at ¶¶ 2, 7. And as alleged in the complaint, all named Plaintiffs purchased their tickets between September 12, 2019, and July 24, 2020. *See* CAC at ¶¶ 4, 19–74. Defendant argues that in purchasing tickets on the StubHub website, registered users and guests are presented with StubHub's operative User Agreement in several different ways. *See generally* Northcutt Decl. Because the Court finds the checkout process web flow was sufficient to provide constructive notice of the User Agreement and arbitration provision to both registered users and guests, the Court does not address the alternative means.

Defendant presents evidence that regardless of whether the user is registered or a guest, when he or she clicks "Checkout" to purchase tickets, a pop-up screen displays, as depicted below:



*See* Northcutt Decl. at ¶ 15. Directly below the "Sign in" and "Continue as guest" buttons, is the sentence: "By purchasing or signing in, you agree to our user agreement and acknowledge our privacy notice." *Id.* The terms "user agreement" and "privacy notice" are underlined, in blue font,

United States District Court
Northern District of California

1    and hyperlinked to those policies.  *Id.*  Defendant represents that "[p]rior displays were the same

2    or substantially similar."  *Id.*

3          **Registered Users.**  As an initial matter, Plaintiffs suggest that the checkout process is

4    somehow insufficient to put registered users on notice of the arbitration provision because the

5    User Agreement has changed over time.  *See* Dkt. No. 44 at 15–18.  They note that 43 of the 56

6    named Plaintiffs registered with StubHub before March 25, 2020, the date of the current User

7    Agreement, and therefore had agreed to different versions.  *See id.* at 16.  But this misses the

8    point.  Although Defendant argues that registered users agreed to the User Agreement during the

9    sign-up process, Defendant argues separately that registered users agreed to the User Agreement

10   as part of the checkout process when they purchased their tickets.  *See* Dkt. No. 39 at 5–6, 12–13.

11   Plaintiffs do not identify any meaningful distinction between the versions of the User Agreement

12   in effect *at the time Plaintiffs purchased their tickets*.  And Plaintiffs' own evidence indicates that

13   all versions of the User Agreement in place when Plaintiffs purchased their tickets between

14   September 2019 and June 2020 contained a similar arbitration provision.  *See* Dkt. No. 44 at 6–9;

15   *see also* Dkt. No. 39-2, Ex. A.

16         During the hearing, the Court asked Plaintiffs directly why registered users did not

17   manifest their assent to the operative User Agreement as part of the checkout process when they

18   purchased their tickets.  *See* Hrg. Tr. at 15:24–16:10.  In response, Plaintiffs suggested that

19   registered users' prior history with StubHub was relevant to the inquiry.  *See id.* at 11:6–15:13;

20   16:11–19:9.  Plaintiffs argued that at the time registered users signed up on StubHub, they were

21   told they would receive email notice about any changes to the User Agreement.  *See id.* at 11:21–

22   12:18.  Because Defendant did not provide any evidence of such notice, Plaintiffs assert that it is

23   reasonable to conclude that they did not provide any email notice of changes to the User

24   Agreement over time.  *Id.*; *see also* Dkt. No. 44 at 17, & n.10.  In short, Plaintiffs argue that

25   because registered users agreed to a prior version of the User Agreement and did not receive email

26   notice of any changes, they are somehow precluded from agreeing to a later version of the User

27   Agreement.

28         The Court is not persuaded.  Plaintiffs offer no authority supporting this reliance-based

United States District Court
Northern District of California

argument.  The only case they cite, *Douglas v. United States Dist. Court for the Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007), is inapposite.  In *Douglas*, the plaintiff had agreed to a service contract with America Online ("AOL").  *See Douglas*, 495 F.3d at 1065–66.  When Talk America later acquired AOL, it changed the service contract to add, *inter alia*, an arbitration agreement, and posted the revised contract on its website.  *Id.*  But Talk America did not provide any direct notice to the plaintiff that the contract had changed.  *Id.*  In vacating the district court's order compelling arbitration, the Ninth Circuit reasoned that "a party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so."  *Id.* at 1066.  "[A] revised contract is merely an offer and does not bind the parties until it is accepted."  *Id.*  But here, in contrast, the checkout screen required even registered users to manifest assent to the current User Agreement at the time they purchased their tickets.  *Accord Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 395 (9th Cir. 2020).[3]

**Guests.**  Plaintiffs next argue that the checkout process on the StubHub website is also insufficient as to the 16 guest users.  Dkt. No. 44 at 20–22.  As noted above, as part of the checkout process, all Plaintiffs who purchased tickets on the StubHub website clicked a button labeled either "Sign in" or "Continue as guest."  *See* Northcutt Decl. at ¶ 15.  Below these buttons was the following hyperlinked statement:  "By purchasing or signing in, you agree to our user agreement and acknowledge our privacy notice."  *Id.*

Plaintiffs first contend that the 16 guest Plaintiffs could not manifest their assent to the User Agreement by clicking the "Continue as guest" button because when they clicked that button they were not actually purchasing tickets yet.  *See* Dkt. No. 44 at 21.  Under Plaintiffs' theory, the disclosure should have read instead "that by 'continuing as guest' or 'by proceeding past this page' [the guest users] would be agreeing to the [User Agreement]."  *See id.* at 20.  Plaintiffs rely on a single district court case, *Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL 5210912, at *1 (N.D. Cal. Sept. 1, 2020), in support of this argument.

In *Berman*, the plaintiffs alleged that they received unsolicited telemarketing text messages

---

[3] As an unpublished Ninth Circuit decision, *Lee v. Ticketmaster* is not precedent, but may be considered for its persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

from digital marketing companies touting services offered by its advertiser clients. *See Berman*, 2020 WL 5210912, at *1. One of the marketing companies operated "consumer-facing websites which offer[ed] users the possibility of rewards, discounts, product samples or entry into sweepstakes." *Id.* The marketing company used these websites to collect the consumers' data for its clients' marketing campaigns. *Id.* The marketing company argued that the plaintiffs' claims were subject to arbitration because the plaintiffs had agreed to terms and conditions on its website that included an arbitration provision. *Id.* In denying the motion to compel arbitration, the court found that there was a material dispute of fact regarding the veracity and completeness of the screenshots that the marketing company offered regarding its website. *Id.* at *3. In the alternative, the court briefly identified other possible problems with the website, including as relevant here that the proffered webpages "do not include a specific affirmative means of indicating consent to the Terms & Conditions or arbitration clause." *Berman*, 2020 WL 5210912, at *3. A screenshot from the marketing company's webpage is depicted below:



*See id.* at *4, Appendix A. In evaluating this screen, the court reasoned that "while there is text including a hyperlink to the terms of the agreement located near a button the user must click to continue, there is no text that notifies users that they will be deemed to have agreed to these terms nor prompts them to take any affirmative action to demonstrate assent." *Id.* at *3 (quotation omitted). And "[t]he 'This is correct, Continue!'" button "plainly refer[s] to the entry of other

1   information on the page, not assent to the Terms & Conditions." *Id.*

2          Here, in contrast, the StubHub webpage clearly explains to guests that "By purchasing or

3   signing in, you agree to our user agreement and acknowledge our privacy notice." *See* Northcutt

4   Decl. at ¶ 15.  Although Plaintiffs are correct that the "Continue as guest" button does not read

5   "buy now" or "purchase," it is the first step in the process to purchase tickets on the website:  the

6   checkout screen with the "Continue as guest" button above only pops up when a guest or

7   registered user clicks "Checkout" to purchase tickets.  *See* Northcutt Decl. at ¶ 15.  Unlike in

8   *Berman*, therefore, there is no risk of confusion as to whether users, by purchasing tickets on

9   StubHub, are agreeing to the User Agreement.

10          Relatedly, Plaintiffs argue that the notice of the User Agreement on the checkout screen is

11   not sufficiently close to the actual "buy now" button.  *See* Dkt. No. 44 at 21–22.  Plaintiffs

12   contend that because the notice of the User Agreement states that "By *purchasing* . . . you agree to

13   our user agreement,"  guest users may only manifest assent to the User Agreement by clicking the

14   "buy now" button.  *Id.*  They point out, however, that the checkout screen with the notice of the

15   User Agreement is "at least five screens removed from the screen on which a 'Buy now' button

16   would allow the visitor to actually purchase tickets." *Id.* at 21, & n.13; *see also* Dkt. No. 51-1,

17   Exs. 1–6.  Plaintiffs also point out that the actual screen with the "Buy now" button does not

18   contain any disclosure about the User Agreement.[4]  *Id.*  Plaintiffs accordingly suggest that "'the

19   design and content of the checkout process distract[ed] users from recognizing the existence of,

20   and need to review' the User Agreement."  *See* Dkt. No. 44 at 21 (quoting *Shultz v. TTAC Publ'g,*

21   *LLC*, No. 20-CV-04375-HSG, 2020 WL 6937818, at *4 (N.D. Cal. Oct. 26, 2020)).

22          Plaintiffs cite *Weber v. Amazon.com,* No. CV 17-8868-GW (Ex), 2018 WL 6016975, at

23   *11 (C.D. Cal. June 4, 2018).  *See* Dkt. No. 44 at 20–21.  In *Weber*, the plaintiffs challenged

24   Amazon's practice of storing customers' credit card information and charging them without

25   authorization for purchases made through various Amazon platforms and services.  *Weber*, 2018

---

[4] There appears to be some dispute about this, as Plaintiffs have provided some screenshots that
show another disclosure on the "buy now" screen and some screenshots that do not.  *See* Dkt. No.
51 at 1–3; *see also* Dkt. No. 51-1, Exs. 1–6.  For purposes of this argument, however, the Court
assumes the "buy now" screen does not contain another disclosure.

United States District Court
Northern District of California

WL 6016975, at *2.  Amazon moved to compel the case to arbitration, arguing that the plaintiffs had constructive notice of Amazon's terms of use from its website and mobile application.  *Id.* at *3.  The court found that the desktop web flows afforded constructive notice of Amazon's terms of use.  *See id.* at *9–10.  However, the court found that the mobile web flow did not provide constructive notice.  *Id.* at *11.  It contained two "Place your order" buttons at the top and bottom of the checkout screen.  *Id.*  But the notice of the terms of use only appeared before the first button.  *Id.*  In denying the motion to compel as to the mobile application, the court reasoned that "a consumer [wa]s unlikely to even notice the small font disclosure" above the first of the two "Place your order" buttons.  *Id.*  The court explained that because "the vital information related to the customer's order follows the first 'Place your order' button," a consumer was unlikely to scroll back up to the top of the screen to click the first "Place your order" button and notice the disclosure.  *Id.*

But as already discussed above, the notice of StubHub's User Agreement is directly below the button to continue as a guest and proceed to purchase.  *See* Northcutt Decl. at ¶ 15.  The reference to the User Agreement is in blue, underlined, and thus set off from the rest of the test, and the actual User Agreement is hyperlinked.  *Id.*  And unlike the web flow this Court considered in *Shultz v. TTAC Publishing*, the StubHub checkout screen does not contain other distracting design elements that obscure the disclosure on the page.  2020 WL 6937818, at *4 (finding design and content, including large green checkmarks and a promotional video, distracted the user from the disclosure).

Lastly, in a footnote Plaintiffs argue that the User Agreement itself "is ambiguous as to its applicability to Guests" because the User Agreement references "users" and not "guests."  *See* Dkt. No. 44 at 20, & n.12.  The Court finds this argument meritless.  Although a guest may not be registered, he or she is still using the StubHub website to purchase tickets.

*        *        *

In short, the Court finds that the checkout screen provides "explicit textual notice that continued use will act as a manifestation of the user's intent to be bound."  *Nguyen*, 763 F.3d at 1176.

United States District Court
Northern District of California

1

ii.    **Mobile Application**

2        Defendant has provided records reflecting that eight named Plaintiffs purchased their

3   tickets as registered users on the StubHub mobile application.[5]  *See* Dkt. No. 59-1 at ¶ 7.

4   However, there appears to be a factual dispute about the constructive notice provided through the

5   mobile application.  In response to Plaintiffs' argument that the "sign in" and "checkout"

6   processes on the mobile application do not contain a disclosure of the User Agreement, the Court

7   gave Defendant an opportunity to respond and, *inter alia*, "provide any materials reflecting

8   relevant differences between the processes for purchasing tickets on the website as compared to

9   the mobile application."  *See* Dkt. No. 58.  In response, however, Defendant did not offer any

10  screenshots or evidence for the sign in or checkout processes on the mobile application.[6]  *See* Dkt.

11  No. 59.  There is therefore insufficient evidence for the Court to conclude that these eight

12  Plaintiffs received adequate notice of the arbitration agreement when they purchased their tickets

13  on the mobile application.

14       In its supplemental briefing, Defendant emphasizes that all eight named Plaintiffs were

15  registered users, and thus agreed to the terms of the User Agreement as part of the registration

16  process.  *See* Dkt. No. 59 at 2–3; *see also* Northcutt Decl. at ¶ 7.  Defendant does not address

17  whether these eight Plaintiffs registered on the website or on the mobile application, but confirms

18  that the sign-up process is substantially the same on the mobile application as on the website.  *See*

19  Dkt. No. 59; *see also* Northcutt Decl. at ¶¶ 66–68, 105–07, 123–28, 138–40, 169–74 (describing

20  date on which Plaintiffs registered and purchased tickets).  Defendant provides the following

21  screenshot of the current sign-up screen on the mobile application:

22

23

24  _____

[5] These include Plaintiffs Dahl, Glaspey, Koble, Matlock, McDaniel, Mignault, Williams, and
25  Wutz.  *See* Dkt. No. 59-1 at ¶ 7.
[6] In his original declaration, Todd Northcutt stated that "[a]pp users receive a [] message with text
26  highlighted in bold contrasting print, that is hyperlinked and states: "By signing up, you agree to
    our user **agreement** and **privacy notice**."  *See* Northcutt Decl. at ¶ 12 (emphasis in original).
27  However, Defendant did not provide any screenshots.  And the screenshots from the mobile
    application that Plaintiffs proffered do not reflect such a disclosure.  *See* Dkt. No. 54-5, Exs. 1–4.
28  At the very least, there is a factual dispute about the nature of the constructive notice provided on
    the mobile application during the checkout process.

Dkt. No. 59-1 at ¶ 6.  However, Defendant does not explain how and to what extent this sign-up screen changed or stayed the same over time.[7]  But these Plaintiffs registered with StubHub at different times from 2003 to 2020.  *See* Dkt. No. 39, Appendix A.  Defendant offers only a conclusory statement for each registered Plaintiff that "[b]y clicking 'Sign up' after completing the User Registration Form . . . the notifications informing [Plaintiff] that [his or her] actions resulted in agreement to the User Agreement were displayed to [him or her] multiple times."  *See, e.g.*, Northcutt Decl. at ¶ 106.

Because the Court does not know what sign-up screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether they received constructive notice of the User Agreement when they signed up with StubHub.  Even assuming these Plaintiffs received constructive notice, Defendant does not provide the User Agreement in place at the time each Plaintiff registered.  For some of these Plaintiffs, therefore, the Court cannot determine if they agreed to a User Agreement with a viable arbitration agreement.  The Court finds that Defendant

---

[7] In contrast, Defendant states that for the checkout process and sign-in screens, "[p]rior displays were the same or substantially similar."  *See* Northcutt Decl. at ¶¶ 15, 17.

United States District Court
Northern District of California

1    has not met its burden of establishing that these eight Plaintiffs entered into an agreement to

2    arbitrate.[8]

3        **B.    Unconscionability[9]**

4        Plaintiffs next argue that the arbitration provision is unconscionable.  *See* Dkt. No. 44 at

5    22–29.  The Court addresses these arguments as they apply to the 48 Plaintiffs who purchased

6    their tickets on StubHub's website.

7        Under California law, an agreement is enforceable unless it is both procedurally and

8    substantively unconscionable.  *See Armendariz v. Foundation Health Psychcare Svcs. Inc.*, 24 Cal.

9    4th 83, 114 (Cal. 2000).  Procedural and substantive unconscionability need not be present in

10   equal amounts.  *Id.*  Rather, the two are evaluated on a "sliding scale," such that the more evidence

11   of procedural unconscionability there is, the less evidence of substantive unconscionability is

12   needed to render the agreement unenforceable, and vice versa.  *Id.*  However, both forms of

13   unconscionability must be present in some amount "for a court to exercise its discretion to refuse

14   to enforce a contract or clause under the doctrine of unconscionability."  *Stirlen v. Supercuts, Inc.*,

15   51 Cal. App. 4th 1519, 1521 (Cal. Ct. App. 1997), *as modified* (Feb. 10, 1997).  Plaintiffs contend

16   that Defendant's arbitration and class waiver clauses are both procedurally and substantively

17   unconscionable, and therefore cannot be enforced.  *See* Dkt. No. 44 at 22–29.

18       Procedural unconscionability "focus[es] on 'oppression' or 'surprise' due to unequal

19   bargaining power . . . ."  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114,

20   (Cal. 2000).  Here, Plaintiffs allege that (1) the arbitration clause and class waiver are adhesion

21   contracts because the Plaintiffs had no meaningful opportunity to negotiate the terms; and (2) the

22

23

---

24   [8] To the extent Defendant also suggests that email notice—provided only *after* these Plaintiffs
     purchased tickets—is sufficient, Dkt. No. 59 at 2 the Court disagrees.  Defendant has not

25   provided, and the Court is not aware of, any legal support for the idea that ex post notice that does
     not require users to manifest assent can establish a valid arbitration agreement.

26   [9] Despite the fact that the User Agreement appears to incorporate the American Arbitration
     Association ("AAA") Rules, during the hearing Defendant conceded that arbitrability issues are

27   for this Court and not the arbitrator to decide.  *See* Hrg. Tr. at 23:18–24:2; *cf. Brennan v. Opus
     Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (holding that at least with regard to sophisticated

28   parties, "incorporation of the AAA rules constitutes clear and unmistakable evidence that
     contracting parties agreed to arbitrate arbitrability.").

United States District Court
Northern District of California

United States District Court
Northern District of California

terms of the arbitration clause and class waiver are incomprehensible to the average consumer.[10]
*See* Dkt. No. 44 at 22–27.

An adhesion contract is "a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *See Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003) (applying California law). Here, the operative version of the User Agreement for these 48 Plaintiffs contained an "opt-out" provision, under which Plaintiffs could reject the arbitration provision and class waiver by sending a written opt-out notice to StubHub within 30 days of accepting the User Agreement. *See* Dkt. No. 45-1, Ex. D at 90–91; *see also* Dkt. No. 39-2, Ex. A at 18. Although the opt-out provision itself appears later in the User Agreement, it is highlighted in **bold** and in all capital letters on the very first page of the User Agreement:

> **FOR ALL USERS RESIDING IN THE UNITED STATES, PLEASE BE ADVISED: CLAUSE 22 OF THIS AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE, WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST US TO BINDING AND FINAL ARBITRATION, UNLESS YOU OPT-OUT. UNLESS YOU OPT OUT: (1) YOU WILL ONLY BE PERMITTED TO PURSUE CLAIMS AGAINST STUBHUB ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING, AND (2) YOU WILL ONLY BE PERMITTED TO SEEK RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ON AN INDIVIDUAL BASIS.**

*See* Dkt. No. 45-1, Ex. D at 75; *see also* Dkt. No. 39-2, Ex. A at 2. The first page of the User Agreement describes both where Plaintiffs can find the opt-out provision and what Plaintiffs are agreeing to if they do not opt out. *Id.* The User Agreement also contains a link to an opt-out notice form. *See* Dkt. No. 45-1, Ex. D at 90. The Ninth Circuit has repeatedly held that "an arbitration agreement is not adhesive if there is an opportunity to opt out." *See, e.g.*, *Mohamed v.*

---

[10] To the extent Plaintiffs also argue that they did not receive adequate notice of the User Agreement, Dkt. No. 44 at 23–24, the Court has already found that the checkout process provided adequate notice to the 48 Plaintiffs who purchased tickets on StubHub's website.

15

1    *Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) (collecting cases).

2        Plaintiffs also contend that the language of the arbitration provision and class waiver is

3    "incomprehensible" to the average consumer.  *See* Dkt. No. 44 at 24–27.  Plaintiffs rely on the

4    Flesch Reading Ease ("FRE") and Flesch-Kincaid ("F-K") tests.  *See id.*  According to Plaintiffs,

5    these tests rely on the number of syllables per word and the number of words per sentence to

6    assess the readability of text.  *Id.*  Plaintiffs cite a 2019 article from Boston College Law Review

7    to support their contention that consumer agreements should score 60 or higher on the FRE test

8    and an 8 (corresponding to an eighth grade reading level) for the F-K test.  *See id.* at 25.[11]

9    Plaintiffs contend that StubHub's arbitration provision and class waiver score a 0 on the FRE scale

10   and 29.1 on the F-K test, and the paragraph about these provisions on the first page of the User

11   Agreement scores 15.7 on the FRE test and 21.8 on the F-K test.  *Id.* at 26.

12       Plaintiffs do not cite any cases considering, let alone adopting, these tests as part of an

13   unconscionability analysis.  And the single California case that Plaintiffs cite does not apply either

14   test.  *See In re E.O.*, 188 Cal. App. 4th 1149, 1157 (Cal. Ct. App. 2010).  Rather, the court

15   references "an online readability tester" in cautioning that "probation conditions—particularly in

16   juvenile cases—should be as *comprehensible* as possible," and that "[c]larity is possible even

17   where the concept is complex."  *See id.* (emphasis in original).  Plaintiffs are correct that courts

18   applying California law have found procedural unconscionability where "the [a]greement is

19   drafted and composed in a manner . . . to thwart rather than promote understanding."  *Davis v.*

20   *TWC Dealer Grp., Inc.*, 41 Cal. App. 5th 662, 672 (Cal. Ct. App. 2019), *reh'g denied* (Nov. 26,

21   2019), *review denied* (Feb. 11, 2020) (finding high procedural unconscionability where typeface

22   "challenge[d] the limits of legibility," was written in a single block of text with no paragraph

23   separation, and required legal training to understand references to statutory provisions).  Yet

24   Plaintiffs have failed to establish that the arbitration provision and class waiver are written to

25   thwart understanding.  To the contrary, the arbitration provision explains in plain language what

26

27   ───────────────

28   [11] Citing Uri Benoliel & Shmuel I. Becher, *The Duty to Read the Unreadable*, 60 B.C. L. Rev.
     2255 (2019), *available at* https://lawdigitalcommons.bc.edu/bclr/vol60/iss8/2 (last visited Nov. 12,
     2021).

United States District Court
Northern District of California

1    arbitration is and the general procedures that would apply to a dispute:

3        Arbitration is less formal than a lawsuit in court.  Arbitration uses a
         neutral arbitrator instead of a judge or jury, and court review of an
4        arbitration award is very limited. However, an arbitrator can award
         the same damages and relief on an individual basis that a court can
5        award to an individual; and an arbitrator must also follow the terms
         of the User Agreement, as a court would.

7    *See* Dkt. No. 45-1, Ex. D at 88–89.  Based on the record before it, the Court does not find the

8    arbitration provision and class waiver procedurally unconscionable.  Because both procedural and

9    substantive unconscionability must be present in order for an agreement to be unenforceable, the

10   Court does not address whether these provisions are substantively unconscionable.

11       **C.     *McGill v. Citibank***

12       Lastly, Plaintiffs contend that the arbitration agreement violates the California Supreme

13   Court's opinion in *McGill v. Citibank N.A.*, 2 Cal. 5th 945 (Cal. 2017), making the agreement

14   unenforceable as to all Plaintiffs' California statutory causes of action.  *See* Dkt. No. 44 at 9–15.

15       In *McGill*, the California Supreme Court held that arbitration provisions are invalid and

16   unenforceable if they purport to waive a plaintiff's statutory right to seek public injunctive relief in

17   any forum.  *See* 2 Cal. 5th at 954–67.  In *McGill*, the plaintiff brought claims under California's

18   Consumer Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), and false

19   advertising laws, and sought an injunction prohibiting the defendant from continuing to engage in

20   its allegedly illegal and deceptive practices.  *Id.* at 952.  The defendant sought to compel

21   arbitration, and the Court held that the arbitration provision was unenforceable because it waived

22   the plaintiff's right to seek public injunctive relief under these statutes in any forum.  *Id.* at 954.

23   The Ninth Circuit has since held that the "*McGill* rule" is a contract defense that is not preempted

24   by the FAA.  *See Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 830–31 (9th Cir. 2019).  Plaintiffs in

25   this case invoke *McGill*, and argue that public injunctive relief is available to redress their

26   consumer protection claims, but that such relief is otherwise precluded under the arbitration

27   provision and class action waiver.  *See* Dkt. No. 44 at 9–15.

28       The current version of the User Agreement similarly appears to waive Plaintiffs' right to

United States District Court
Northern District of California

public injunctive relief:

> **2. Non-Individualized Relief**
> YOU AND STUBHUB AGREE THAT THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S). **ANY RELIEF AWARDED CANNOT AFFECT OTHER USERS OR THE GENERAL PUBLIC.**  If a court decides that applicable law precludes enforcement of any of this paragraph's limitations as to a particular claim for relief, then subject to your and StubHub's right to appeal the court's decision, that claim (and only that claim) must be severed from the arbitration and may be brought in court.  All other claims will be arbitrated.

*Id.* at 6–9 (quoting Dkt. No. 39-2, Ex. A) (emphasis added).  However, the parties dispute whether Plaintiffs are seeking public injunctive relief for their claims.

Under *McGill*, public injunctive relief is relief "that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." *McGill*, 2 Cal. 5th at 955.  On the other hand, "[r]elief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff— does not constitute public injunctive relief." *Id.*; *accord Hodges v. Comcast Cable Commc'ns, LLC*, 12 F.4th 1108, 1115 (9th Cir. 2021) ("[P]ublic injunctive relief within the meaning of *McGill* is limited to forward-looking injunctions that seek to prevent future violations of law for the benefit of the general public as a whole, as opposed to a particular class of persons, and that do so without the need to consider the individual claims of any non-party.").

Plaintiffs seek injunctive relief in the consolidated class action complaint, requesting:

> [A]n immediate public injunction requiring StubHub to honor its longstanding refund policy, to preclude StubHub from unilaterally changing the terms of the guarantee or, alternatively, to proliferate clear, conspicuous, and extensive corrective advertising to notify consumers that the FanProtect™ Guarantee no longer means a cash refund, and that StubHub maintains it can change the meaning of the guarantee unilaterally at any time.  Alternatively, the Court should order StubHub to stop using the FanProtect™ Guarantee logo and disseminate corrective advertising to the public to explain that the guarantee is no longer in effect.

United States District Court
Northern District of California

CAC at ¶ 15; *see also* Prayer for Relief at (h).

Despite this language, Defendant suggests that Plaintiffs are nevertheless simply seeking to remedy past harm for named Plaintiffs and putative class members who previously purchased tickets. *See* Dkt. No. 39 at 19–22. However, this ignores the allegations in the CAC. Plaintiffs allege that Defendant has spent over a decade marketing its FanProtect™ Guarantee as a full refund for canceled events. *See, e.g.*, CAC at ¶¶ 89–91. But Plaintiffs allege that during the COVID-19 pandemic, StubHub "surreptitiously changed the terms of its FanProtect Guarantee™ on the backpages of its website . . . ." *See id.* at ¶ 83. Plaintiffs explain that they are not just seeking to remedy past harm because "[t]oday, StubHub continues to use the FanProtect™ Guarantee trademark and prominently displays it on its website home page." *See id.* at ¶ 11. But Defendant has not "restore[d] the fullfledged FanProtect™ Guarantee," and "market[s] and hold[s] out its offers of an expiring credit, rather than a full refund, under its trademarked FanProtect™ Guarantee." *See id.* at ¶ 89. Plaintiffs further allege that StubHub now "trade[s] on the popularity and recognizable benefits associated with its former guarantee and has failed to make the changes in policy apparent on its website and mobile app." *Id.* at ¶ 91. Plaintiffs urge that their request for injunctive relief will therefore primarily benefit the general public by "protect[ing] any member of the public . . . who purchases tickets from StubHub in the future." Dkt. No. 44 at 13–14. In other words, Plaintiffs seek an injunction to ensure that future consumers are not misled into believing that Defendant will provide users with a full refund for canceled events under the FanProtect™ Guarantee. As the Ninth Circuit recently explained, "[t]he paradigmatic example [of public injunctive relief] would be the sort of injunctive relief sought in *McGill* itself, where the plaintiff sought an injunction against the use of false advertising to promote a credit protection plan." 12 F.4th at 1115. Although some of the relief Plaintiffs seek may only benefit Plaintiffs or StubHub customers who have purchased tickets through StubHub, the Court finds that Plaintiffs are also seeking this "paradigmatic example" of public injunctive relief, to preclude Defendant from misrepresenting to the general public the protections afforded by its FanProtect™ Guarantee.

Although Defendant may disagree with the likelihood of such future harm, the Court finds that Plaintiffs have adequately established that their requested injunctive relief is designed to

United States District Court
Northern District of California

1    prevent future harm to members of the public and not just the specific named Plaintiffs or class

2    members.[12]  *Accord Snarr v. HRB Tax Grp., Inc.*, 839 F. App'x 53, 55 (9th Cir. 2020) (finding

3    arbitration agreement unenforceable under *McGill* where plaintiff sought to "generally enjoin

4    future violations of [CLRA, UCL, and FAL], in addition to describing specific terms for injunctive

5    relief to remedy [defendant's] allegedly misleading web services and advertising").

6            The Court further rejects Defendant's attempt to characterize this action as merely a breach

7    of contract case between StubHub and its individual customers.  *See* Dkt. No. 39 at 21–22.  As

8    explained above, the allegations in the CAC are not so limited.  Plaintiffs do not simply bring

9    causes of action for breach of contract, but rather contend that Defendant has misrepresented the

10   nature and extent of its FanProtect™ Guarantee in its advertising, and on its website and mobile

11   application.  *See, e.g.*, CAC at ¶¶ 89–91.  As such, Plaintiffs bring causes of action under

12   California law for violations of the CLRA, UCL, and False Advertising Law ("FAL"), as well as

13   causes of action for negligent misrepresentation.  *Id.* at ¶¶ 122–57, 172–79.  Moreover, at least as

14   alleged, Plaintiffs' breach of contract cause of action appears based on Defendant's advertising of

15   the FanProtect Guarantee, and not the terms of the User Agreement.[13]  *See id.* at ¶¶ 185–91.

16           Defendant also responds that Plaintiffs do not actually seek public injunctive relief, but

17   rather "seek money damages (refunds) to compensate them in their private contract dispute with

18   StubHub over purely past purchases."  *See* Dkt. No. 48 at 15.  Certainly Plaintiffs also seek

19   monetary relief.  *See* CAC, Prayer for Relief.  But Defendant appears to suggest that because

20   Plaintiffs seek monetary damages in addition to injunctive relief, their requested injunctive relief

21   cannot primarily benefit the general public.  *See id.*; *see also* Dkt. No. 39 at 19.  Defendant offers

22   no authority to support this contention.  Nor does it appear consistent with *McGill* or Ninth Circuit

23   precedent.  The Court understands Defendant's skepticism that Plaintiffs may have included

24

25   ---
[12] To the extent Defendant suggests that the district court's order in *Ajzenman v. Off. of Comm'r of*
26   *Baseball*, No. CV203643DSFJEMX, 2020 WL 6037140, at *6–8 (C.D. Cal. Sept. 14, 2020),
     suggests a different conclusion, the Court respectfully disagrees with its reasoning.  In any event,
27   the Court finds the facts distinguishable as *Ajzenman* concerned only StubHub's conduct and
     plaintiffs' alleged harm regarding canceled tickets for the 2020 Major League Baseball regular
28   season.
[13] Defendant's waiver argument, *see* Dkt. No. 39 at 22, fails for the same reason.

allegations regarding public injunctive relief precisely because of *McGill*.  Nevertheless, their motivation for doing so is simply irrelevant to the inquiry.  Accordingly, the Court finds that the arbitration agreement and class waiver is not enforceable as to Plaintiffs' California causes of action.

## IV.  CONCLUSION

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to compel arbitration:

- The Court **GRANTS** the motion as to those Plaintiffs who purchased their tickets on the StubHub website and **STAYS** the case pending arbitration as to these Plaintiffs, except as otherwise noted below;

- The Court **DENIES** the motion as to those Plaintiffs who purchased their tickets on the StubHub mobile app; and

- The Court **DENIES** the motion as to Plaintiffs' California causes of action under *McGill*.

The Court further **SETS** a telephonic case management conference on December 7, 2021, at 2:00 p.m.  The parties should be prepared to discuss how to move this case forward efficiently. All counsel shall use the following dial-in information to access the call:

Dial-In:  888-808-6929;

Passcode:  6064255

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.  The joint case management statement is due November 30, 2021.

**IT IS SO ORDERED.**

Dated:  11/22/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge